For the Appellant we have Ms. Bullock, and for the Appellee we have Mr. John Schmidt and Mr. Scott Anderson, and I see you're dividing your time. You may proceed, Counsel. May it please the Court, Counsel. My name is Ellen Bullock, and I represent Charles and Melissa Yetz, the grandparents of E.Y. and the Petitioners and Appellants. In an adoption, as we all know, there is a guardian ad litem appointed, and the guardian ad litem's job is to represent the best interests of the child to the Court. In this case, E.Y.'s guardian ad litem recommended that E.Y. be adopted by my client. She said, my recommendation is that the Yetz petition for adoption be approved. The GAL recognized the sibling relationships, but found that they were outweighed by past and likely future risk of domestic violence. She said, I think the Yetz are the better placement for her future. And she also expressed concerns that I reiterate here today. DCFS caseworkers are not concerned about the violence in the home, but rather appear to be only concerned about the violence between Sarah and Chase. Domestic violence went on in the Wuranga home, and I am concerned about individuals being allowed back in the Wuranga home. Whether they're visiting or living there, it doesn't make a difference. Somebody who visits a home can hurt a child greatly. And it's concerning to me that several of the witnesses who testified were workers with DCFS, and they were not aware of that. They were not aware of the domestic violence that occurred in the home, other than perhaps between Sarah and her paramours. But there was more to it than that. Things apparently occurred even while E.Y. had been placed in the Wuranga home. Now, on this appeal, and in my brief as counsel for the appellant, there is laid out a chart of all the domestic violence that I could collect from the record in the home of the Wurangas. It spans multi-generations, and it involves more than just Sarah. It involves other members of Michelle Wuranga's household. And it includes violence that DCFS is aware of, and more importantly, it includes violence that DCFS is not aware of, and violence that is ongoing right now. During the best interest of time. Absent some expert witness testifying about the effects or impact of what you allege to be generational domestic violence, what's the relevance of an incident happening to the mother many years before? The grandmother many years before. The Sarah Kijanowski mother, the mother of the child, the birth mother of the child? The grandmother many years before. Right. That actually was raised through DCFS's own report. It was raised in DCFS's own home and background that Michelle Wuranga had had this 24 years of horrific domestic violence against her. And it was raised because Sarah Kijanowski, the murderer mother, was then a child. And as a child, she suffered. As far as expert witness testimony, we did have expert witnesses in this case. I hired an expert who performed a home and background on my clients, the Yetts. But we have an ultimate expert. You pound on this generational domestic violence, but have no one come in to testify about it as a concept or a theory or that there's some conclusion that can be reached from these allegations of generational domestic violence. And I was kind of wondering why not, because that seemed to be the theme that you beat into this case at the trial court. Well, for one reason, one of the why nots, and only one. There are several. But one of them is that we didn't find out about the most recent domestic violence until... That was during the trial, right? What do you call the most recent domestic violence? The most recent domestic violence would be while EY was a foster child, and while Sarah Kijanowski was locked up in jail, so it did not involve her, two of the older brothers, Tom and Tim Kijanowski, were in the house. They got a little tipsy. They got aggressive. There were sometimes children present. It happened more than once. The two brothers got into a fight? Yes. Did they get into a fight? No, they didn't get into a fight, because I wasn't clear on that. I mean, I remember someone saying, and then they opened their mouth too much. But I wasn't real clear on exactly what occurred. Your Honor, that's right. We didn't know until the trial what occurred, and the testimony came in through a witness we called who was a young man in his 20s who lives at the home. His name is Kyle Patterson, and he was asked and he admitted that, yes, they do fight. So he was specifically asked, do they fight? I mean, when you say, we got in a fight, is that verbal? Is that physical? Did we get any more detail on that? We didn't get a lot of detail. Well, the detail we did get, that it happened multiple times, and that it involved loud, raised voices in fighting that caused the children to be scared. And that the children were sometimes present and had this reaction. Going back to both Your Honor's points, I would like to say that we do have in a way the ultimate expert, because Deborah Dyer Webster, the guardianship administrator for the State of Illinois, testified that when children are present during violence and fighting, even if they're not actually hit or contacted, she said, yes, even very young children are impacted by violence. And she said it's a psychological impact, and it hurts. But she didn't prove your client's adoption? She did not, no. And she didn't know about the recent violence of my clients, but she did say that it is harmful to children to have the type of violence that we proved up during our best interest time. And you asked her if she would take into consideration these other incidents that you told her about, right? And she said she didn't know of them, but she should have taken them into consideration. But it still didn't change her opinion? No, it did not. This was a six-day hearing? Yes, partial days, but yes. And when it was over, the trial court made an extensive record of findings and all that? Yes, it did. It's not unusual in cases of this kind that there are competing arguments to be raised, and someone's going to have to resolve those. The burden of proof, however, of the standard review is that you have to demonstrate that the trial court's finding, after all this evidence and careful deliberation, essentially was unreasonable. Well, guess the manifest weight of the evidence. That's why I use the term essentially. That's what that means, isn't it? Essentially an unreasonable finding based on this evidence? Right. And I think, Your Honor, I absolutely agree. I cannot disagree that that is our burden. But I will tell you that we have met our burden, and we do not map down from our burden. And here's one of the pieces of evidence that relates to against the manifest weight of the evidence. When the trial court wrote that long, extensive opinion, it said that there was no violence, no evidence of violence after Sarah went to jail. Everybody kind of wanted to blame this on Sarah, understandably. She murdered Chase Yates. But everybody wanted to put it on Sarah, and the court kind of made a finding that was inaccurate. And in my brief, I quote, and I'll raise it again now, in the Mariana F.M. case, it said that held that when child custody is at stake, and where the court makes a misunderstanding or a misstatement of a material fact, such as this court did, in ignoring the other evidence, that the trial court's finding was inaccurate. There was ongoing domestic violence that the GAL was aware of, but the court apparently did not. Well, there's a difference of, as you put it, ignoring it or just not citing it in its ruling. I mean, this is a long ruling. We often hear the court ignored X, Y, or Z. If you're looking at a bench composed of trial court alumni, we understand that when making rulings, the court points out those things which are most important. It doesn't mean that the court is ignoring or misunderstood the evidence not discussed. Why should we think the trial court here simply misunderstood or ignored pertinent evidence? Well, I think your position is that the trial court got it wrong. Misstated what the evidence showed. That's your position, right? Absolutely. Not that it ignored it. I think it ignored evidence of domestic violence by misstating that none had occurred since Sarah went to prison. And that's why I asked for the clarification. Because my concern is that perhaps there is a difference of perception because of this lack of clarification as to what exactly happened. Perhaps the trial court doesn't consider two brothers who have been out maybe having a little too much to drink and they're jabbing at each other. Perhaps the court didn't consider that domestic violence. Well, I don't know if it did or not consider that because it never said that, what you just said. So I'm going to assume that it didn't because domestic violence as it was described, first by Kyle Patterson, but then it was confirmed by Norm Moringa who said, yes, he had had to intervene. Now, I agree with you that we were getting this new from Kyle Patterson and the lawyer's best friend, Hidesight. I wish I had pushed Kyle Patterson further. But the things that Kyle Patterson admitted under oath and Norm Moringa backed up is it happened multiple times and that the Moringas were needed to intervene. Now, was it specified as to whether or not that happened before or after mom went to prison and the child was placed with them? It happened after and we know that because Michelle Moringa admitted that it happened in the evening. It happened in January of 2016, which is a year after Chase Yates. Chase Yates was murdered in January of 2016. The children, Sarah Kijanowski, as Chase lay bleeding and dying, as you can see from the brief, she called on the phone, 911. They told her to staunch the wounds. At the same time, she called on the phone, her mother, and said, come get the kids. And that became the placement for these children and it was never touched and it was never changed. My clients tried desperately to get involved in the juvenile case and were not allowed. And then they became licensed foster parents, just for the heck of it, so they could be available for all three children. And then they appeared in court and petitioned to adopt. Do you contest whether or not DCFS followed proper procedure? You know, you say and you argue in your brief that basically the mother got to choose the placement. Yes, she did. Do you contest that DCFS followed the proper procedure? Absolutely, I do. I think that DCFS abused its discretion and the court will grant me leave to play this out. DCFS kept the child with the maternal grandparents. I think they, in good faith, thought that the child should be with her twin sisters. I do not deny that that is a good thing and I don't think anybody has contested that. But when it came time for DCFS to handle this case and the best interest petition, they were served with a copy. They put an affidavit. Deborah Dyer-Webster signed the affidavit. The affidavit said, I want the child with the Warangas. At that time, she did not know of the ongoing domestic violence. She should have. That was her job to know about that. And at the time she signed that affidavit, then she went to court and she testified. She testified and then, I'm sorry, let me move back one step. Before she went to court to testify, after she had done her affidavit, but before she appeared in court, the two DCFS administrators, Deborah Dyer-Webster, the outgoing, and Janet Wilkes-Ahern, the incoming, went to visit the Yetzes. That is fine. They were doing some sort of investigation of the best interest of the child. Because there was ongoing litigation, I appeared at the home as the lawyer for the Yetzes. The Yetzes were asked if they would honor the foster relationship and bond between E.Y. and the Warangas, should they be allowed to adopt. And they both said yes, they would. Then Deborah Dyer-Webster appeared in court and she lied about Melissa Yetz. And this supports her abuse of discretion because she was digging her heels in another side. She was asked, would the Yetzes allow visitation with the Warangas and E.Y., were they allowed to adopt? And she said, no, they were not. And then I got up and I said, I was there. Could I ask you, could you clarify, did either Charles or Melissa Yetz say that they would allow? She said, yes, Charles did. Well, you know what that is? That's her saying two totally, utterly different things on the whole. Who is this witness you're talking about? Deborah Dyer-Webster, the DCFS administrator. And you outlined this in your brief. Yes, I did. And so with the court ultimately making the decision with respect to the adoption, is that something that you believe was heavily relied upon by the court? I believe that DCFS abused its discretion. And I believe that the court relied on DCFS and that it went against the manifest weight of the evidence in doing so. Why did the court rely upon DCFS? I was the juvenile court judge for 12 years in Champaign County. I heard lots of cases like this. DCFS says X, parties say Y and Z. You're arguing, well, the court just relied on DCFS. Says who and why? Why wouldn't the court exercise the court's own independent judgment? Well, I think the courts do exercise independent judgment. In this case, why wouldn't it have done so? You're arguing as if the court was simply a DCFS rubber stamp. No, I am not. I am arguing that the court had its own guardian ad litem and that it had evidence of an injurious environment, which under the statute for best interest factors is a consideration and a factor in a seriously heavily weighed consideration, and that the court got it wrong and went against the manifest weight of the evidence. I am not saying other than that. But I do think that all of these different things, and there's lots of evidence, as you are all aware, well aware, but I am also aware, I do think that my client's position that the manifest weight of this evidence because of the dangers involved in an injurious environment should have favored them. Well, let me ask this question. The maternal grandparents are the prevailing party who's at the trial level, and that's what's repeated. With regard to domestic violence, as you argued it, what reason is there to believe that there will be violence in the home of the maternal guardians, or the maternal grandparents, rather, who are now the, have custody of these children? Well, I think the biggest piece of evidence would be that since she's been a foster child, there has been, and that creates, as the GAL noted, that creates a risk of future violence. I didn't understand. Say that again. Because while they were foster parents and the child was in their home, there has been domestic violence. Between their sons, between the mom's sons, to be technical. Yes, and it has, I agree that it is something that we don't have a police report on, but that's because no police report was filed. I agree it's something that DCFS did not lay out. Well, just as Holder Rice tries to have this fleshed out, it's not clear to me exactly what this is, and how big a problem this is, and you're making it sound like this is a danger for these children. Yes, I am. Well, based on what? If I'm the trial judge, what is there, counsel, to cause me to think that these brothers, and what happened, the siblings who came home, assuming they were drunk and fighting with each other, that this is somehow a danger for the children, or this is going to be repetition, or this is going to be something which makes this, assume otherwise appropriate placement, inappropriate? Well, I guess I would argue, and am arguing, that it creates an injurious environment. And an injurious environment, and maybe perhaps back to Justice Yarman's point, a multigenerational domestic violence. But like him, I don't understand what multigenerational domestic violence means. Is this kind of like a bill of attainder for past generations that applies now to the present people? No, I think it creates an injurious environment within the home. Well, don't you have to identify beyond a drunken dispute, maybe fisticuffs, between older siblings in that home on this one occasion? Don't you have to demonstrate something beyond that that's going to demonstrate to the trial court, this isn't a fit place for these young kids? Well, actually, I think that it isn't a fit place for these young kids. That's what I feel, and that's what I feel we have demonstrated. But if I may. Well, based on domestic violence, you're essentially arguing this domestic violence stuff is really bad. The trend is it's not a fit place. And I'm asking for, you know, we see lots of cases here of domestic violence, and they're rather more serious and more repeated than this one incident is described. And what happens in those cases? Their children are removed, right? Well, sometimes it's more repeated and more serious, and children might be involved. But with the children involved in this case, do they see it? If I may. Go ahead. I understand what you're saying, but I also have not changed my position on this appeal. If you look at the 24 hours before Chase Yates was murdered, there was escalating domestic violence involving Michelle Waringa. Now, Sarah Kijanowski, the perpetrator of that violence, both the day before when she scratched Chase Yates and there's blood on his face, and then she went back to the home after she had the kids out there, and then they went back, and then she murdered the father, okay? Now, then she called her mother. I would say that these patterns, and I agree with you that you can't do sort of the past always equals the future. Also, I'm so sorry, you're out of time. I'm going to let you finish your thought there, but then after that you are out of time at this point anyway. Thank you, Your Honors, all of you. I would say that the patterns of domestic violence are relevant. They've been admitted by DCFS to be relevant because they can create a future cause of harm, and the GAL found them relevant, whose job it is to advocate for the best interest of the child. Thank you so much. Mr. Schmidt. Thank you, Your Honors. John Schmidt on behalf of the Department of Children and Family Services. I disagree with counsel's statement about some of the facts there. I'm going to direct the court to where it can find the testimony about the incidents involving the brothers. Kyle Patterson in the transcript at 175 and 76. Mrs. Waringa at 965. Mr. Waringa at 876 and 77. One thing she said was there was evidence the children were scared. There is no evidence of that whatsoever. Kyle Patterson said they were generally sleeping when these incidents happened. Mr. Patterson also, what he said was that the one or the other, something like one or the other of the brothers would come home, sometimes be tipsy, sometimes be loud, and then either Norman or Michelle would intervene and tell them to stop, and they would either stop or they would leave. Not clear whether those were verbal or physical. What does the record show as far as their continued presence in this home? One of the brothers was living there, right? And he was not involved in these incidents. So this is not the brother who was living there helping the mom? These were both brothers who lived outside the home. Are they going to be there a lot, or what does the record show about this? It doesn't show that they were living away from the home. I don't think they even lived in Champaign. So they would drop by sometimes, but no, they were not there a lot. These were occasional situations where they would stop by late at night. Now, do you agree that multiple incidents of this nature took place after the child was placed with the maternal grandparents? The answer is we don't know. Kyle Patterson did not say when any of these incidents took place. We only know about one of them. Michelle Waringa, and I believe that's at 876 and 77 of the record, said an incident took place after January 1st, 2016. That was probably during the relevant time because they became the foster parents on January 21st. But that incident involved just one brother, Tom, showing up drunk. She said, basically, quite downrightly, he left. So that's the only incident that we know likely happened during the relevant time, during the time when they were foster parents for EY. The question I want to ask, Ms. Bullock, I want to ask you now. It appears that the trial court placed great weight on the fact that all three of these children could be kept together, and that was an important thing and very much in EY's best interest. Do you agree that the trial court did that, and do you agree that that's appropriate? Yes, I'd answer yes to both of those questions, Your Honor. The trial court also noted that it was, I believe that this was also a stable placement, and that it would be traumatic for the child to have the placement changed because of the relationship with the Waringas, but also placed great importance on preserving the sibling relationship, and we think that's absolutely appropriate, especially under the circumstances of this case. This is a situation where there was testimony from two experts, Carrie Kaufman, who was the case manager from CYFS, that these children had an amazing bond. A CASA volunteer, Carrie Candy Murphy, said she had never seen a bond like that between a young child and older siblings. If the petitioner's petition for adoption had been granted, does that mean that it would only have been regarding EY, that the other sisters would not have been with her? Yes, and yes, that is correct, Your Honor. It would mean that the siblings would have to be split. My understanding is the Waringas' adoption of the other two children has now been approved, so it would mean that they would not live together, and any visitation would be subject to it. The child was arguing something about the, is it Yetz, is that pronounced correctly? I think that's all right, correct. They never mentioned that to DCFS, and they never took steps. Now, her theory, her argument is the fact that they got a foster parent license indicates they were willing to take all three, but DCFS, because you don't need one if you're taking a relative, but DCFS does give preference to people with foster care licenses, so it was in their interest to get one just for EY. I heard Ms. Bullock's argument about Deborah Nyer-Webster and the representations that she said were incorrect that she had made. What about that? As she pointed out, Ms. Nyer-Webster corrected her testimony later on, and then Janet Ahern of DCFS testified that the Yetz's were willing to allow some visitation, so Janet Ahern also would have corrected that testimony. She's a DCFS official. Also, nothing in the trial court's lengthy decision indicates that it relied on that. Nothing. So, and Your Honors have emphasized that this, or excuse me, I would emphasize too that this is a very deferential standard of review, and the trial court in this case thoroughly went through the record. We don't think that the finding that there was no domestic violence was an error after the they became foster parents was an error. The record really didn't show it. The one incident Norman did testify, and I want to make this clear, Norman did testify that he intervened in a fight between the two brothers. Did not say whether it was verbal or not. He said he simply stepped between them. I just want to make it clear. Norman did not say whether it was a physical or verbal fight. He said he just stepped in between them, talked to them, and it was over. Thank you. Thank you, Counsel. Mr. Anderson. Good afternoon, Justices. Scott Anderson, Jr., attorney for the intervenors and appellees. You folks have really reached the crux of the matter, and I think it would bear just looking at the testimony itself. If you look at the chart, which is on page 17 of her brief, in which she lists these alleged incidents of domestic violence, there's one with respect to that she relies on as being continuing after E.Y. was in the Waringa home. The first is the testimony of Kyle Patterson on cross-examination by me, which appears at the report of proceedings of page 175 and 176. It reads, question, other than Sarah and Chase having violent confrontations at the house, were you aware of or present for any other violent confrontation of other people in the house? Answer, I have been there for aggressive situations between us. What situations? Aggressive situations between others. And who were those? Like the older brothers, either Tom or Tim. They'd just go out, get a little too tipsy, and like to open their mouth. Question, okay, and were the children present at that time? Answer, no, or not always. Question, well, on the times when they were there, was Michelle or Norman also present? Yes, they were both there. And did they do anything to either take charge of or care for the children in that instance? Answer, well, usually the kids would be asleep. It was late at night type of thing, and when it would happen. But other than that, they would tell them, you know, stop for the kids, you know, this is a family environment, not a bar. Question, did these children comply? Answer, yeah, they would typically comply. If they felt still agitated, they would end up leaving. All right, and were they ordered to leave until they calmed down? Usually. As soon as mom said something to them, they would kind of snap out of it enough to take a breather. All right, and by mom you mean Michelle? Michelle. Michelle Wieringa, yes. All right, and then the second one they rely on, this is the one to try and place the time as to when it occurred, is on page 876 and 877 of the report of proceedings, which where Ms. Bullock is asking, and beginning on line 9, says, okay, now Kyle Patterson also testified that he observed Sarah's brothers, Tim Kijanowski and Tom Kijanowski, get drunk and that you would tell one or both of them to leave. Do you recall any of these incidents? And she answers, Tim no longer. He is a stepdad. He no longer does anything. He now makes over $20 an hour and is living a clean life, doing great things, doing nothing wrong. Tom is doing the same thing. If he's going to do something wrong, he's not allowed in my house. Okay, the he's not allowed to be back in the house. Question, do you recall any times when either Tim or Tom has been since January 1, 2016? Answer, Tom, and I had said he needs to leave and go back to where he was. Question, okay, now you kind of cut off my question, which is fine, but I want to understand it. So Tom was drunk at your house, is that right? Answer, he had come to the house and I told him to leave. Now, then Mr. Poe and I both started raising objections and Ms. Bullock went on to a different subject. But here in this instance, I think, frankly, if you look at that, that Michelle Waringa was really finishing her answer to the first question. She first was saying was Tim was doing this, and then secondly, she's explaining about Tom. Not saying, actually agreeing with the date that Ms. Bullock was asking about. I don't think she was. Well, let me ask you the same question I asked Ms. Bullock. Okay. The question is essentially, if I'm in the trial court, what would be my concerns about these two guys? Let's view this evidence partially. But there are a couple of drunken blouts who have access to this house and might misbehave and create problems or a bad environment for the kids. What would be your response to that? No, Judge, that's not true. Well, I think the answer is that this was not ongoing at that time. It hasn't occurred while EY has been in their home and that this testimony really didn't come up with that date. She suggested the date, but Michelle Waringa did not really answer that question. Well, what does the record show regarding their future presence, access to this house, their future presence with the EY and the other girls present? What does it say about any of that? Well, I think the answer was the children were at most in bed when these things occurred. None of it was ever directed towards them and it didn't disturb them in any way. Well, let me be more direct. Assuming I think they're a bad influence, that there are a bunch of drunken blouts in the house and that Michelle will do that. Michelle has essentially said that I'm the mother of these children and it's going to be my responsibility to protect them. And I have told them that if they're going to act that way, they can't come to this house. And I think there's testimony to that effect. The trial judge heard that? Yes. And the trial judge basically said that he did not agree that any domestic violence had occurred since the date that EY had come into the home. So he either agreed with my analysis that the date was never agreed to or that he didn't think that any domestic violence had actually occurred, merely that they had gotten loud and boisterous and arguing. I asked Mr. Sprint if he agreed that keeping the three daughters together would be very important in the court's eyes and that that could only be accomplished by granting the petition of the intervenors. Well, I think it was. Is that correct? I think it was. I think in fact that was in the end, he decided that it would be a tragedy as in fact that the DCFS workers and several others had testified that it would be to take her from this home. She at that time had been almost about two weeks short of two years in the home. Now it's two years and eight months. I mean to wrest her from the environment that she's enjoyed with the Waringas and with her sisters at this point would be tragic. If the petitioners petition had been adopted by the court instead of your clients, what would be the circumstances regarding the ongoing relationship between EY and her sisters? The guesses had indicated that if they had had if they were being successful that they would in fact allow EY to have visitation with her sisters. So I think that had the ruling been the other way that in fact she would see her sisters but not live with them. What about having the opportunity for petitioners to spend time with EY with your clients having to do that? My clients testified and I believe it's carried through to this day that they would continue to have every other weekend and one night a week and they further indicated that if they wanted a week or two in the summer to take EY to their lake house in the Danville area that they would be welcome to do that. And they have court ordered visitation, is that correct? They had court ordered visitation in the juvenile case and that was obtained through mediation with my clients and I think DCFS also participated. There's no court ordered visitation after granting the adoption but your clients said we will continue it anyway. That's correct and I believe have. So in summary there were lots of things I think that the court relied upon in reaching this decision. One of which is in fact that my clients as the foster parents have under Section 1 of the top part of 2 of the primary statute here the foster parent preference, that the siblings are to be kept together, that there is in fact a consent decree and there shall be relating to that, that there is a statute on that subject, that there are regulations, that the placement was done properly and that they looked first to determine whether or not there was a relative who was related to all three of the siblings who were coming into care at that time. The Wieringas were the only ones that fit that description and on top of it at the time the Yetzes were in Las Vegas. They weren't available that night. And then the second thing they have to determine is of course is that party, this relative willing to take all three and yes the Wieringas were. And third is the home safe. And in their inspection of the home itself, yes it was safe. The issues of domestic violence again I think come back to Sarah and are primarily Sarah and that's the way the court found it to be based on the testimony that was listed. Question being asked. Question being asked. Sitting judge. Yes I think this was her last case. Question being asked. Well first of all her testimony was that of an expert essentially. And there were tons of experts on the other side. We had Kerry Coffman the case worker. We had the two guardianship administrators both past and then present. And CASA also recommended your client correct? I'm sorry who? CASA. Yes, yes the CASA worker in the DCFS case, juvenile case had also recommended them and testified to the incredible bond that the children had. How old are the children now? EY is now I believe four years old and I believe the twins are three years older than she is. They have been adopted by the Waringas so if this court were to reverse this decision it would in fact necessarily mean that EY would not live with her sisters. Do you have any further questions? I don't see any counsel, thank you. Thank you. Appreciate your attention. Ms. Bula. Thank you. On rebuttal. A couple clarifications just quickly. Kerry Coffman has said that the amazing bond was with the birth mother Sarah Kijanowski not with the Waringas. I don't think it's that relevant. The yeses were in Arizona not Las Vegas, not that it necessarily matters. Okay. Quickly on rebuttal. Brother Theodore, the one that was referenced that was not Tom or Tim, there were also several incidences of domestic violence against him. They were arrests that didn't go forward and they involved older dates. He wasn't free from violence, just to clarify your Honor's point. It was just older violence that didn't involve Tom and Tim, the other two brothers we're talking about. And on rebuttal, I need to get this straight. Michelle Waringa is not a reliable witness on domestic violence. We know this because the day before Chase Yates was killed, Michelle Waringa was in the driveway with Sarah Kijanowski and Sarah Kijanowski scratched Chase Yates and Michelle Waringa told the investigating police officer that she couldn't remember a thing because of her disabling brain aneurysms. She can't have it both ways. Either she has disabling brain aneurysms and that police officer came to our trial. Either she has disabling brain aneurysms that would preclude her caring for these four children, or she understates domestic violence in her home to the authorities because she knows that's the way to get around it. She can't have it both ways. I would like to say that for the statute, which we need to return to briefly here, the best interest factor statute, the half-siblings are family ties to EY. We have never doubted that. But the statute is actually worded that family ties, including siblings, are important. The statute co-equal family ties between my clients, Charles and Melissa Yates, who are the paternal relatives of this child. Those are co-equal family ties and have never been trumped by the half-sisters ties. So I agree they are important, but they are not the only important family tie. And if you're going to look at the statutory factors, family ties is one factor, but there are many factors. And the safety of children and the risks of an injurious environment through domestic violence, which this court has recognized the injurious environment presented to children, as have all the courts in Illinois. It's in the brief. I won't go through the cases. But injurious environment can affect the other factors in the best interest. The adjustment to the child's home, the mental and physical health of the persons involved, the background and the living arrangements of the applicants to adopt. There are statutory factors at play here, but they don't solve the case. And they didn't solve the case below when the trial court was looking at it. Very briefly on rebuttal, mid-violence rescue, which is what Michelle Waringa is touting to this court. Mid-violence rescue? Yes, and I'm glad your Honor asked. I'm not sure what that means. I'm really glad your Honor asked. When Michelle Waringa was questioned, and she's the one that said it was only once, it was only Tom, it wasn't him, he's a good guy now. When she was questioned about what she did to intervene, because she said she intervenes and stops the violence. She said, I'm a peacemaker, I'm 90% successful in my intervention and my children are 10%. Is that when somebody ends up dead on the floor like Chase Yates? And second of all, in that 90%, what does that look like for the 90%? When you come in and make peace, what's going on? She said, and she said it clearly, the children were bothered. They didn't like the screaming. So we know that the children were bothered, they didn't like the screaming, she would get involved and as my opposing counsel pointed out, she would throw them out or try to get rid of the violence or get it out of her house. But I would say 90% isn't that great a rate. Counsel, here's the thing that I don't understand. If this is supposed to be, and it seems like it's one of the major arguments you have, why wasn't this pursued more to make a better record? How often will these guys be there? Under what circumstances? What are you going to do about it? Et cetera. We don't have any of that, do we? Well, I think we have a history of violence. We have an inference at best, but if this is your primary argument, and there they are testifying, let's flesh this out. Yeah, I think that we did try to flesh it out, and Michelle Waringa went backwards and said, I always intervene, I'm a peacemaker. That was one attempt to flesh it out with her. With Kyle Patterson, I agree. It wasn't fleshed out as much. Frankly, it was a bit of... How about calling the brothers? I think that they are not available, and we did pursue that. And we were at mid-trial, and Anna Benjamin was going on the bench. I don't want to make excuses, but if you want an actual what was happening on the ground, we were mid-best interest trials. Anna Benjamin was going on the bench. There were things going on. I say, yes, a better trial lawyer may have elicited more information, but we do have information, and DCFS itself could have followed up on that information, because it said itself, it should have known that. So not only the petitioner's attorney, but DCFS itself at that point could have followed up on that information. This was one of their children in their care. Thank you very much. Thank you, counsel. We'll take this matter under advisement and be in recess at this time.